# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**TYRAH JENKINS,**　　　　　　　　:
　　　　　　　　　　　　　　　　　　:
　　　　**Plaintiff,**　　　　　　　:
　　　　　　　　　　　　　　　　　　:　　**CIVIL ACTION FILE NO.**
**v.**　　　　　　　　　　　　　　　:　　**1:16-cv-02905-AJB**
　　　　　　　　　　　　　　　　　　:
**NANCY A. BERRYHILL,**　　　　　:
***Acting Commissioner, Social***　:
***Security Administration,***　　　:
　　　　　　　　　　　　　　　　　　:
　　　　**Defendant.**[1]　　　　　 :

---

## O R D E R   A N D   O P I N I O N[2]

Plaintiff Tyrah Jenkins ("Plaintiff") brought this action pursuant to

sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g),

1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the

Social Security Administration ("the Commissioner") denying her application for

---

[1]　On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. Under the Federal Rules of Civil Procedure, Berryhill "is automatically substituted as a party." Fed. R. Civ. P. 25(d). The Clerk is hereby **DIRECTED** to amend the case style to reflect the substitution.

[2]　The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. (*See* Dkt. Entries dated 8/11/16). Therefore, this Order constitutes a final Order of the Court.

Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") under the Social Security Act.[3]  For the reasons below, the undersigned **REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I.  PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on October 30, 2008, alleging disability commencing on June 1, 2004.  [Record (hereinafter "R") 23, 134-47; Doc. 10 at 1[4]; Doc. 13 at 1].  Plaintiff's applications were denied initially and on

---

[3]        Title II of the Social Security Act provides for federal Disability Insurance Benefits.    42 U.S.C. § 401 *et seq.*    Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for Supplemental Security Income Benefits for the disabled.  Title XVI claims are not tied to the attainment of a particular period of insurance eligibility.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim. *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims, and vice versa.

[4]        Where Plaintiff's page numbering conflicts with the numbering assigned by the Court's CM/ECF system, the Court's pinpoint citations to Plaintiff's brief will utilize the page numbering assigned by the CM/ECF system.

AO 72A
(Rev.8/8
2)

reconsideration. [*See* R70-73]. Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). [R94]. An evidentiary hearing was held on July 26, 2010. [R40-66]. The ALJ issued a decision on February 22, 2011, denying Plaintiff's application on the ground that she had not been under a "disability" at any time from the alleged onset date through the date of the decision. [R23-34]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on June 20, 2012, making the ALJ's decision the final decision of the Commissioner. [R10-15]. Plaintiff then filed an action in this Court in September 2012, seeking review of the Commissioner's decision. *Jenkins v. Colvin*, Civ. Action No. 1:12-cv-3355-ECS (N.D. Ga.), ECF Nos. 1-3. After Plaintiff filed her initial brief, the Commissioner filed a consent motion under sentence four of 42 U.S.C. § 405(g) to enter a judgment with a reversal and remand of the cause to the Commissioner for further proceedings and issuance of a new decision. *Id.*, ECF No. 11 (May 1, 2013). On May 28, 2013, the Court granted the motion and entered an Order reversing the decision under sentence four, remanding the case to the Commissioner for further proceedings, and specifying that upon remand, the Commissioner was to instruct the ALJ to further develop the record and obtain testimony from a vocational expert. *Id.*, ECF No. 12.

3

AO 72A
(Rev.8/8
2)

Pursuant to the Order entered by the District Court, the Appeals Council directed the Commissioner to offer Plaintiff a new hearing, address evidence that was submitted to the Appeals Council, take any action needed to complete the administrative record, and issue a new decision. [R514-16]. A second evidentiary hearing was held on February 19, 2015, before a different ALJ. [R460-511]. The ALJ issued an unfavorable decision on May 4, 2015, denying Plaintiff's application on the ground that she had not been under a "disability" at any time from the onset date through the date of the decision because she was able to perform past relevant work as it is generally performed. [R440-59]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on June 25, 2016, making the ALJ's decision the final decision of the Commissioner. [R432-39].

Plaintiff then initiated the present action in this Court in August 2016, seeking review of the Commissioner's most recent decision. [Docs. 1-3]. The answer and transcript were filed on December 12, 2016. [*See* Docs. 6, 7]. On January 10, 2017, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 10]; on March 10, 2017, the Commissioner filed a response in support

AO 72A
(Rev.8/8
2)

of the decision, [Doc. 13]<sup>5</sup>; and on March 21, 2017, Plaintiff filed a reply brief in support of her petition, [Doc. 14]. The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).[6]

## II.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in

---

[5]    The response brief was timely filed pursuant to a Consent Order entered by the Court on February 9, 2017. [Doc. 12].

[6]    Neither party requested oral argument. (*See* Dkt.).

AO 72A
(Rev.8/8
2)

any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner. The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity. *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). At step four, if the claimant is unable to prove the existence of a

6

listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id*.

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

AO 72A
(Rev.8/8
2)

## III.  SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance."  *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as

8

a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239. "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam). Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## IV.    ADMINISTRATIVE DECISION[7]

Plaintiff was born on August 21, 1979, and therefore was thirty-five years old at the time the ALJ issued the second adverse decision. [R156, 453]. She alleges disability due to schizoaffective disorder, bipolar disorder, severe depression,

---

[7]    In general, the records referenced in this Order are limited to those deemed by the parties to be relevant to this appeal. [*See* Docs. 10, 13, 14].

posttraumatic stress disorder ("PTSD"), generalized anxiety disorder, and borderline intellectual functioning. [R160, 466].

Plaintiff reports that her mental impairments cause her to experience auditory hallucinations, visual hallucinations, and paranoia, and that she has been seeing doctors since she was a teenager. [R268, 282, 353, 472]. She indicates that she has been terminated from multiple jobs due to her hallucinations and fighting with coworkers and bosses, [R44, 392], and that she had been expelled from school for fighting and went to an alternative school, [R472]. She indicates that she spends most of her day alone in her room sleeping due to her medications. [R58, 489, 498]. She also testifies that she does not cook, vacuum, or do laundry, and she breaks dishes when she washes them. [R486-89]. She states that she watches the news on television and shops with her mother but that she does not shop alone because she hears voices and sees things and it becomes overwhelming. [R490, 491, 494]. She indicates that she drives about once a month. [R491]. She reports that she sees her mother, stepfather, children, and boyfriend, but does not have any other friends or socialize with other family members. [R58, 493, 500-01].

Plaintiff reports that although she takes the medication prescribed by her psychiatrist, she continues to experience auditory and visual hallucinations, paranoid

10

thinking, and bizarre perceptual thoughts, like seeing dead people walking around, thinking someone will kill or hurt her, and constantly thinking in detail about how she, her mother, and her kids would die. [R497-98]. She continues to be paranoid and to see things that are not there and to hear voices and sounds on a daily basis. [R497-98, 501-02]. She testifies that although she takes her medication every day and night, her condition is still like a roller coaster: she will have a month or two when she feels better—she still sees and hears things and has panic attacks and paranoia, but it is not as intense—and then her condition will worsen again. [R496-97, 501-03].

In the decision issued after the second hearing, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since June 1, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: schizoaffective disorder, cocaine abuse, bipolar disorder, posttraumatic stress disorder (PTSD), generalized anxiety disorder (GAD) and borderline intellectual functioning (BIF) (20 CFR 404.1520(c) and 416.920(c)).

. . .

AO 72A
(Rev.8/8
2)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity [("RFC")] to perform a full range of work at all exertional levels but with the following nonexertional limitations:  The claimant is able to perform simple, routine, repetitive tasks and work must be limited to occasional changes in the work setting and occasional interaction with the public and coworkers.  She is unable to meet fast-paced, high production demands.

. . .

6.      The claimant is capable of performing past relevant work as a kitchen helper (DOT number 318.687-010, medium, SVP 2).  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

. . .

7.      The claimant has not been under a disability, as defined in the Social Security Act, from June 1, 2004, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

[R445-53].

12

AO 72A
(Rev.8/8
2)

## V.    CLAIMS OF ERROR

Plaintiff contends that the ALJ committed two reversible errors, which caused

the decision of non-disability not to be supported by substantial evidence:

1.    The ALJ assigned "significant" weight to medical opinions regarding limitations in Plaintiff's ability to interact with supervisors, co-workers, and the public, but did not fully accommodate them in the RFC or explain why.

2.    The ALJ found that Plaintiff could return to past work without first determining what job duties were actually required, and despite conflicting vocational evidence as to whether the work was "relevant" within the context of the disability determination.

[Doc. 10 at 9-26].  The Court shall address each argument in turn.

### A.    *Medical Opinions of Social Limitations*

Plaintiff presented to Steven Snook, Ph. D., for a consultative psychological

evaluation on March 4, 2010.  [R352-56].  Dr. Snook noted that Plaintiff had been

under the care of a psychiatrist for outpatient treatment of bipolar disorder,

schizophrenia, and depression since 2004; was seen every one month to three months;

13

was, at the time, prescribed divalproex,[8] Zyprexa,[9] and Paroxetine HCL[10]; and still reported persistent depression, anxiety, and hallucinations, such as hearing voices that talk to her about harming people and seeing people who are "on fire." [R352-55]. He also noted a history of cocaine and marijuana use and a history of multiple past arrests for theft. [R353]. He further noted that Plaintiff had worked for one or two months at Winn-Dixie in or around 2001 but left due to hallucinations; she had held a similar position at Publix but was terminated for falling asleep in the bathroom; in 2003, Plaintiff had worked at Longhorn Steakhouse as a hostess but quit due to her hallucinations; she was employed for about ten months at Budget Car Rental Company giving receipts to customers but was fired after wrecking a car; and she was last

---

[8]     Divalproex sodium is used by the body as valproic acid. Valproic acid is an anticonvulsant medication used to treat certain types of seizures, to prevent migraine headaches, and to treat mania in people with bipolar disorder. MedlinePlus, Valproic Acid, https://medlineplus.gov/druginfo/meds/a682412.html (last visited 3/7/18).

[9]     Zyprexa (olanzapine) is used to treat schizophrenia and bipolar disorder. It is in a class of medications called atypical antipsychotics. MedlinePlus, Olanzapine, https://medlineplus.gov/druginfo/meds/a601213.html (last visited 3/7/18).

[10]     Paroxetine, commonly sold under the brand name Paxil, is a selective serotonin uptake inhibitor ("SSRI") used to treat depression, panic disorder, and social-anxiety disorder. MedlinePlus, Paroxetine, https://medlineplus.gov/druginfo/meds/a698032.html (last visited 3/7/18).

14

employed for one month in 2008 by a temporary staffing company putting together boxes. [R353].

Plaintiff reported that she had repeated the first grade; was diagnosed with dyslexia; received special education services from the first grade through the sixth grade; and completed a vocational high-school diploma. [R354]. She reported that she got into fights and was sometimes sent to an alternative school. [R354]. She indicated that she would typically stay to herself but that she once punched the principal. [R354].

Dr. Snook interviewed both Plaintiff and her mother about Plaintiff's activities of daily living. [R354]. Plaintiff stated that on a typical day, her mother would wake her up, Plaintiff would then help get her son ready for school, and Plaintiff would then go back to bed. [R354]. She would then get up again, help get her daughter ready, and drop her off at daycare. [R354]. During the day, she would mostly watch television or sit in her room; her mother and stepfather do all of the housework, and her mother cooks, does all of the shopping, pays the bills, and assists Plaintiff with her laundry. [R354]. Plaintiff does not use public transportation independently. [R354]. She has a driver's license, but no automobile, and although she may occasionally drive her mother's car, her mother usually drives her. [R354]. Plaintiff can make sandwiches and count change correctly, is involved in the care of her dependent children, and will

15

play with them, feed them, bathe them, and assists her son with his homework. [R354]. She does not listen to the radio or read, but she will watch television programs on the History Channel and Sci-Fi Network, which she is able to understand and follow. [R354]. She sees her boyfriend once or twice a week and sees her mother and stepfather daily but reports having no other friends or interaction with other family members. [R354]. She does not attend religious activities, go out to movies, or out to eat. [R354]. She is able to dress herself and manages her own personal hygiene, but her mother reports that she needs prompting around her hygiene. [R354]. Plaintiff's mother reported her activities of daily living as "nothing, she mostly sleeps." [R354]. Plaintiff's mother also reported that she had to "escape" to a shelter along with Plaintiff when Plaintiff was about fourteen years old, that Plaintiff's father was sent to prison for molesting Plaintiff, and that there was a positive family history of psychiatric illness. [R354].

Dr. Snook noted that although Plaintiff made poor eye contact, gave up on intelligence testing when faced with any challenges, and moved about frequently in her chair, she was compliant, cooperative with the assessment, and appeared to be a reliable informant. [R352, 354-55]. He diagnosed schizoaffective disorder, bipolar type; cocaine abuse (by history); and borderline intellectual functioning; and he assessed a

16

global assessment of functioning ("GAF") score of 40.[11] [R356]. Dr. Snook further opined that Plaintiff's insight and judgment were poor, [R355]; she could adequately maintain attention and sustain concentration to perform simple, but not complex, tasks, [R356]; she could comprehend and carry out simple instructions adequately, but would have difficulty comprehending or recalling more complex directives, [R356]; she "would have difficulty interacting with peers, supervisors, or the general public due to her hallucinations and paranoia," [R356]; she may be able to adhere to work schedules and meet appropriate production norms in unskilled work, [R356]; her functioning would continue along the lines previously described, [R356]; and if awarded benefits, Plaintiff would not be capable of managing her funds effectively. [R356].

On March 31, 2010, state agency psychological consultant John Petzelt, Ph. D., reviewed the record, assigning "great weight" to Dr. Snook's evaluation. [R373]. Dr. Petzelt opined, among other things, that Plaintiff had a marked limitation in her

---

[11] The GAF is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000). A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id*. at 34.

AO 72A
(Rev.8/8
2)

ability to interact appropriately with the general public, [R358]; "could benefit from supportive supervision," [R359]; and could relate socially in a satisfactory manner but may have occasional or episodic difficulty with social relations with coworkers and would do better on tasks not requiring any contact with the general public, with neither limitation being "substantial," [R359].

The ALJ acknowledged that Dr. Snook found that Plaintiff would have difficulty interacting with peers, supervisors, and the general public because of her hallucinations and paranoia, [R450]; stated that he gave Dr. Snook's opinions "significant weight because they are consistent with the evidence of record," [R450-51]; and stated that Dr. Snook's opinions support the RFC determination, [R451]. The ALJ also assigned significant weight to the opinion of Dr. Petzelt. [R452].

In her first allegation of error, Plaintiff contends that the limitations contained in the RFC—limitation to simple, routine, repetitive tasks, occasional changes in the work setting, occasional interaction with the public and coworkers, and no fast-paced, high-production demands—do not encompass all of the credited social limitations and that the ALJ did not meet his obligation to explain the inconsistency. [Doc. 10 at 9-17].

The Commissioner, in response, argues that the ALJ properly evaluated the opinion evidence in determining Plaintiff's RFC. [Doc. 13 at 4-12]. First, the

AO 72A
(Rev.8/8
2)

Commissioner asserts that the ALJ did not err in declining to adopt Dr. Snook's opinion wholesale because the regulations and case law do not require that the opinion be adopted in its entirety, [*id.* at 7-8], and the ALJ did not state that he was adopting the opinion or affording it controlling weight, [*id.* at 7]. Second, the Commissioner contends that it was not error for the ALJ to fail to expressly discuss Dr. Snook's opinion regarding interactions with supervisors because "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision enables to court to conclude that the ALJ considered the claimant's medical condition as a whole." [*Id.* at 8 (punctuation omitted)]. Third, the Commissioner argues that the ALJ reasonably interpreted Dr. Snook's opinion in conjunction with the other evidence of record to find that Plaintiff could have occasional interactions with the public and coworkers and that Plaintiff fails to show that Dr. Snook's opinion that Plaintiff "would have difficulty interacting with peers . . . or the general public" necessitated additional limitations not already included in the ALJ's RFC assessment. [Doc. 13 at 9 (comparing [R449-52] with [R356])]. Finally, the Commissioner contends that other record evidence constitutes "substantial evidence" to support the ALJ's conclusion regarding the social limitations included in the RFC: reviewer Dr. Petzelt's March 2010 opinion that Plaintiff could relate socially

19

in a satisfactory manner but may have occasional or episodic difficulty with social relations with coworkers and would do better on tasks not requiring any contact with the general public and that neither limitation is "substantial," [R359, 373]; treatment notes from the period of time between April 2013 and December 2014 stating that Plaintiff was alert, cooperative, and/or communicative, [R633-34, 638, 640, 642-44, 646, 648, 652]; treatment notes from an October 2014 examination during which Plaintiff reported improvement in her condition since Loxitane[12] was added to her treatment regimen, including "much better" social functioning and improved attention skills; she stated that the treatment was effective with no significant side effects; and Plaintiff's psychiatrist observed that Plaintiff was dressed appropriately, made good eye contact, displayed intact speech and language skills, and was less anxious, [R635-36]; and treatment notes from an December 2014 examination during which Plaintiff reported that her mood and psychotic problems were improved and that she was doing better in all settings, that her attention skills were improved, and that her mood swings were less frequent, and Plaintiff's psychiatrist observed that Plaintiff was "very cooperative," communicative, and neatly dressed, and that she displayed an appropriate

---

[12]    Loxitane (loxapine) is used to treat the symptoms of schizophrenia. It is in a group of medications called conventional antipsychotics. MedlinePlus, Loxapine, https://medlineplus.gov/druginfo/meds/a682311.html (last visited 3/7/18).

AO 72A
(Rev.8/8
2)

affect, a less anxious and depressed mood, soft but coherent speech, and fewer indicators of psychotic process, [R633-34]. [Doc. 13 at 9-11].

After careful consideration of the arguments, the ALJ's decision, and the evidence of record, the Court is persuaded that the ALJ reversibly erred in his consideration of Dr. Snook's opinion. The Commissioner does correctly contend that the ALJ did not state that he was adopting Dr. Snook's opinion wholesale, [R450-51], and that the ALJ was not required by law to adopt the opinion, *see Beegle v. Soc. Sec. Admin.*, 482 Fed. Appx. 483, 486 (11th Cir. July 23, 2012) (explaining that an ALJ "does not have to defer to the opinion of a physician who conducted a single examination, and who was not a treating physician") (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987)). These arguments are, however, beside the point: the ALJ *did* specifically acknowledge Dr. Snook's opinion that Plaintiff "would have difficulty interacting with peers, supervisors, or the general public due to her hallucinations and paranoia" and went on to give "Dr. Snook's opinions significant weight because they are consistent with the evidence of record," [R356, 450-51], yet the only social limitations the ALJ included in the RFC were limitations to occasional interaction with the public and coworkers, [R448-49]. It is therefore patently obvious that the ALJ credited Dr. Snook's opinion regarding difficulty interacting with

AO 72A
(Rev.8/8
2)

supervisors but did not accommodate the opinion in the RFC. [*Compare* R450-51 *with* R448-49].

The Court also is not persuaded by the Commissioner's argument that Dr. Petzelt's opinion and other record evidence post-dating Dr. Snook's opinion supply substantial evidence to support the ALJ's treatment of Dr. Snook's opinion. While Dr. Snook was a consultative examiner, [R352-56], Dr. Petzelt, in contrast, rendered a consultative opinion upon review of the record, [R357-74]. "[T]he opinion of a non-examining physician who has reviewed medical records may be substantial evidence if it is consistent with the well-supported opinions of examining physicians or other medical evidence in the record." *Hogan v. Astrue*, Civ. Action No. 2:11cv237-CSC, 2012 WL 3155570, at *5 (M.D. Ala. Aug. 3, 2012) (harmonizing Eleventh Circuit cases). However, "the report of a non-examining doctor is accorded little weight if it contradicts an examining doctor's report; such a report, standing alone, cannot constitute substantial evidence." *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991); *see also Kemp v. Astrue*, 308 Fed. Appx. 423, 427 (11th Cir. Jan. 26, 2009) (per curiam). Here, Dr. Petzelt rendered his reviewing opinion a mere twenty-seven days after Dr. Snook rendered his examining opinion, [*compare* R359, 361 *with* R352], and Dr. Petzelt not only stated without caveat that he gave

22

Dr. Snook's opinion "great weight," including his opinion that Plaintiff "would have difficulty interacting with peers, supervisors, or the general public," [R373], but Dr. Petzelt also opined that Plaintiff "could benefit from supportive supervision," suggesting that Plaintiff would require greater-than-average supervisory involvement, [R359]. Nevertheless, Dr. Petzelt's functional capacity assessment did not include any reference to limitations regarding Plaintiff's ability to interact with supervisors. [R359]. Given the unreconciled conflict between Dr. Snook's examining opinion and Dr. Petzelt's reviewing opinion, the Court finds no basis for crediting Dr. Petzelt's opinion over Dr. Snook's.

The treatment notes the Commissioner cites are similarly unhelpful. It is true that the record contains treatment notes from the time period spanning from April 2013 through December 2014 wherein Plaintiff's psychiatrists observed that Plaintiff was alert, cooperative, and/or communicative, [R633-34, 638, 640, 642-44, 646, 648, 652], and that notes from October and December 2014 indicate that changes in Plaintiff's medication reduced her psychotic symptoms, [R633-36]. [Doc. 13 at 10-11]. The Commissioner does not, however, point to any portion of the ALJ's decision where he relied on the notes, [*see id.*], and the Court's own review has revealed none, [*see* R443-53]. A court cannot draw *post hoc* conclusions from the evidence but

AO 72A
(Rev.8/8
2)

instead must determine whether the ALJ properly applied the law and supported the decision with substantial evidence. *See Baker v. Comm'r of Soc. Sec.*, 384 Fed. Appx. 893, 896 (11th Cir. June 23, 2010) ("If an action is to be upheld it must be upheld on the . . . bases articulated in the agency's order.") (citing *FPC v. Texaco, Inc.*, 417 U.S. 380, 397 (1974)); *Patterson v. Chater*, 983 F. Supp. 1410, 1413 (M.D. Fla. 1997) (holding that it is the duty of the ALJ—and not the court—to draw inferences from the evidence and resolve conflicts in the evidence); *see also Hendrix ex rel. S.F.H. v. Astrue*, No. 1:12-cv-2086, 2013 WL 4718223, at *16 (N.D. Ga. Sept. 3, 2013) (Duffey, J., *adopting* Scofield, M.J.) ("An ALJ may not arbitrarily pick and choose facts from the evidence to support his conclusions without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence.") (citing *Marbury v. Sullivan*, 957 F.2d 837, 839-41 (11th Cir. 1992) (per curiam)). Here, there is no indication that the ALJ rejected any portion of Dr. Snook's opinion, much less the opinions regarding Plaintiff's social limitations: he assigned Dr. Snook's opinion "significant weight," without caveat, and went so far as to quote the portion discussing Plaintiff's social limitations. [R450-51]. Thus, the examination notes the Commissioner cites supply the Court no basis for

24

AO 72A
(Rev.8/8
2)

affirming the ALJ's decision to omit from the RFC any limitation in Plaintiff's ability to interact with supervisors.

It further bears remark that in addition to showing that there were occasions between April 2013 and December 2014 when Plaintiff was observed to be alert, cooperative, and/or communicative, [R633-34, 638, 640, 642-44, 646, 648, 652], and that notes from October and December 2014 indicate that changes in Plaintiff's medication at least temporarily reduced her psychotic symptoms, [R633-36], the cited treatment notes suggest that the severity of Plaintiff's mental impairments and resulting social limitations fluctuated and remained significant well after Dr. Petzelt rendered his reviewing opinion in March 2010. On April 9, 2013, Plaintiff's psychiatrist noted that Plaintiff was doing well on her current medications, was cooperative, did not report symptoms of depression or anxiety, stated that the voices were quiet and that she was less paranoid, and reported improvement in family and social functioning, [R652]; however, on October 4, 2013, Plaintiff's psychiatrist noted that although Plaintiff remained compliant with medication, her anxiety symptoms had worsened, she had more auditory hallucinations and paranoia, and she was doing poorly in social settings, and he increased her Zyprexa dosage, [R648]; on November 12, 2013, it was noted that Plaintiff's depressive symptoms and racing thoughts were worse, Plaintiff was not

doing well, her response to treatment was not as effective, she was hearing voices more frequently, her psychomotor activity was reduced, she presented with an anxious mood and affect, she had persistent paranoia and suspiciousness, her sleep was poor, her social functioning was poor, she thought about death daily, with nighttimes worse, and she had presented to the emergency room for anxiety, [R646]; on March 13, 2014, Plaintiff's psychiatrist noted that despite consistent compliance, Plaintiff's mood swings were worse and affecting her overall functioning, she had been very irritable, anxious, frustrated, and edgy, the voices were persistent, her sleep was poor due to persistent racing thoughts, Plaintiff appeared to be tense, her mood was irritable, psychotic signs were noted, Plaintiff's impulse control and social judgment were observed to be poor, and there was no improvement in social and family functioning, and he explained that because Plaintiff's medication was not working, he would discontinue Plaintiff's Depakote[13] and begin treatment with Tegretol,[14] [R642-43]; on

_____

[13]      Depakote is a brand name under which valproic acid is sold. MedlinePlus, Valproic Acid, https://medlineplus.gov/druginfo/meds/a682412.html (last visited 3/7/18).

[14]      Tegretol (carbamazepine) is an anticonvulsant medication used to control seizures, treat nerve pain, and treat episodes of mania or mixed episodes in patients with bipolar I disorder. MedlinePlus, Carbamazepine, https://medlineplus.gov/druginfo/meds/a682237.html (last visited 3/7/18).

26

AO 72A
(Rev.8/8
2)

July 22, 2014, Plaintiff's psychiatrist noted that despite compliance, Plaintiff reported no improvement in her clinical condition, Plaintiff was "all over the place," with a depressed, frustrated, and edgy mood, Plaintiff's family and social function were affected, Plaintiff was unable to control her mood swings, Plaintiff was unable to quiet her thoughts for sleep, her thoughts were racing and persistent all day, psychotic symptoms were present, eye contact was fair, psychomotor activity was reduced and not spontaneous, Plaintiff appeared unhappy and tense, and her affect was constricted and moderately depressed and anxious, and he added Latuda[15] to her treatment plan, [R640-41]. Thus, even if the decision indicated that the ALJ considered the cited treatment notes, the notes offer scant support for the Commissioner's suggestion that Plaintiff's social limitations had eased.

The Court certainly recognizes that an ALJ need not explicitly assign weight to every aspect of a medical opinion or refer to every piece of evidence in his decision so long as it is clear that the ALJ considered the claimant's medical condition as a whole. *Newberry v. Comm'r, Soc. Sec. Admin.*, 572 Fed. Appx. 671, 672

---

[15] Latuda (lurasidone) is used to treat the symptoms of schizophrenia and to treat depression in people with bipolar disorder. It is in a class of medications called atypical antipsychotics. MedlinePlus, Lurasidone, https://medlineplus.gov/druginfo/meds/a611016.html (last visited 3/6/18).

(11th Cir. July 14, 2014); *Dyer*, 395 F.3d at 1211. Here, however, given the ALJ's unqualified assignment of "significant weight" to Dr. Snook's opinion that Plaintiff would have difficulty interacting with supervisors, [R356, 450-51], particularly in light of the ALJ's assignment of "significant weight" to Dr. Petzelt's opinion, which further noted that Plaintiff "could benefit from supportive supervision," [R359, 452], and evidence that even with continued compliance, Plaintiff's social capabilities fluctuated, [R638, 640, 642-44, 646, 648, 652], it is not clear that an RFC containing no restrictions pertaining to limited ability to interact with supervisors reflects consideration of Plaintiff's medical condition as a whole. Consequently, the undersigned concludes that the decision of the Commissioner is due to be **REVERSED and REMANDED** for further consideration of the opinion evidence regarding Plaintiff's social capabilities.[16]

---

[16]    Because the frank omission from the RFC of any limitation regarding Plaintiff's ability to interact with supervisors makes clear that the ALJ erred in his consideration of Dr. Snook's opinion regarding Plaintiff's social limitation, the Court need not—and does not—reach the question of whether the RFC's limitation to "occasional interaction with the public and coworkers" was sufficient to accommodate his assignment of significant weight to Dr. Snook's opinion that Plaintiff would have difficulty interacting with peers and the general public, [*compare* R356, 450-51 *with* R448-49], or his assignment of significant weight to the opinion of Dr. Petzelt, who opined that Plaintiff was "markedly limited" in her ability to interact appropriately with the general public, [*compare* R358, 452 *with* R448-49]. Nevertheless, the whole of Dr. Snook's and Dr. Petzelt's opinions regarding Plaintiff's social limitations should

AO 72A
(Rev.8/8
2)

## B.    Past Relevant Work

The ALJ found that Plaintiff had past relevant work as a kitchen helper. [R452, 483-84, 506].  At the second ALJ hearing, a vocational expert ("VE") testified that if Plaintiff had the residual functional capacity to perform work with no exertional limits, but would be limited to simple, routine, repetitive tasks, be limited to occasional changes in the work setting, and occasional interaction with the public and coworkers, and would not be able to meet fast-paced, high-production-demand work—the limitations appearing in the RFC—she would be able to perform the work of a kitchen helper. [R507].  Based on the VE testimony, the ALJ found that Plaintiff could perform her past work as a kitchen helper.  [R452-53].  Plaintiff takes issue with the ALJ's determination that she is capable of performing past work as a kitchen helper. [Doc. 10 at 18-26].

Were this the only allegation of error before the Court, it is unlikely that an order reversing and remanding the case would have issued.  First, the allegation of error is confusingly stated.  Plaintiff's brief does not clearly set forth a statement of the legal standard the ALJ purportedly failed to meet, instead diving straight into her arguments without setting forth any framework.  [Doc. 10 at 18-26].  Plaintiff's allegations are

_____

be reexamined and addressed upon remand.

AO 72A
(Rev.8/8
2)

also internally inconsistent: she argues, in part, that the ALJ did not properly develop the evidence in determining that Plaintiff worked as a kitchen helper, that she performed the work for any meaningful amount of time, or that the work was substantial gainful activity, and thus appears to contend that the ALJ's determination that she had past relevant work as a kitchen helper is not supported by substantial evidence. [*Id.*]. However, Plaintiff herself refers to having "past relevant work as . . . a kitchen helper," [*id.* at 6], and in her reply brief, she avers that "[t]he Commissioner misstates [her] argument as asserting that she did not have past relevant work as a kitchen helper," [Doc. 14 at 8]. Second, in alleging that ALJ erred by finding that Plaintiff could return to past work without first determining what job duties were actually required in her past work, Plaintiff appears to disregard the fact that the ALJ did not base his determination on Plaintiff's ability to work as a kitchen helper as she performed the work, but that he instead solicited VE testimony as to whether a person of Plaintiff's RFC could perform the work of a kitchen helper as it is generally

AO 72A
(Rev.8/8
2)

performed and determined that Plaintiff could work as a kitchen helper on that basis.[17]

[R452-53].

Be that as it may, upon remand, the Commissioner will need to reevaluate whether Plaintiff can perform her past relevant work because he erred by granting significant weight to certain medical opinions but failing to craft the RFC to accommodate the social limitations stated in those opinions. *See supra* Part V.A. In other words, it will be necessary to determine whether, taking into account all of the social limitations credited by the ALJ, a person with the resulting RFC will be capable of working as a kitchen helper, any other past relevant work Plaintiff may have performed, or other work available in significant numbers in the national economy.[18]

---

[17]    To determine whether a claimant retains the capacity to perform her past relevant work, the Commissioner examines whether (1) the claimant has the capacity to perform the actual demands and job duties of a specific past job; **or** (2) the claimant has the capacity to perform the demands and job duties of the occupation as generally required by employers in the national economy. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2). "A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy." *Id.*

[18]    Moreover, even lacking a coherent argument from Plaintiff, the Court is troubled by the scant nature of the evidence that Plaintiff has past relevant work as a kitchen helper. Past relevant work "is work that [a claimant] has done within the past 15 years that was substantial gainful activity and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). While it may

AO 72A
(Rev.8/8
2)

## VI.  CONCLUSION

For the reasons above, the Court **REVERSES** the final decision of the Commissioner and **REMANDS** the case for further proceedings consistent with this opinion.  The Clerk is **DIRECTED** to enter final judgment in Plaintiff's favor.

**IT IS SO ORDERED and DIRECTED,** this the 7th day of March, 2018.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

---

be possible to piece together record evidence supporting the finding that Plaintiff has past relevant work as a kitchen helper, [R153-54, 483-84], it is also true that the testimony supporting the conclusion was at least somewhat equivocal: Plaintiff testified that Rare Hospitality International, the company her earnings report shows she worked for in 2003, is a temporary placement agency; that it assigned her to work at the Western hotel, where she worked in the kitchen and washed dishes; that she could not remember how long she worked there or whether it was full time; and that "they would send us to different people like weekly, so I was always somewhere new," [R483-84, 506].  The ALJ's finding that Plaintiff was working as a kitchen helper also conflicts with other record evidence that during the time period referenced by the ALJ, Plaintiff worked not as a kitchen helper but as a cashier, hostess, or waitress, [R52, 161, 166, 189, 211, 241, 353].  It also bears noting that the ALJ's decision itself contains no explanation or rationale for determining that Plaintiff had past relevant work as a kitchen helper, [R452; *see also* R506], nor does there appear to be any basis in the record for a finding that even if Plaintiff did not have past relevant work as a kitchen helper but had the RFC to perform the work as it is generally performed, the work is available in the national economy in sufficient numbers to allow for a finding of non-disability at step five.  For all of these reasons, even in the absence of an amended RFC, the vocational findings merit further review upon remand.

AO 72A
(Rev.8/8
2)